[Cite as *State v. Howard*, 2024-Ohio-2490.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

State of Ohio                                          Court of Appeals No. S-23-007

      Appellee                                    Trial Court No.  21 CR 843

v.

Jermaine J. Howard                              **DECISION AND JUDGMENT**

      Appellant                                   Decided:  June 28, 2024

* * * * *

Beth A. Tischler, Sandusky County Prosecuting Attorney, and
Alexis M. Otero, Assistant Prosecuting Attorney, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**ZMUDA, J.**

{¶ 1} Appellant, Jermaine Howard, appeals from the judgment of the Sandusky County Court of Common Pleas convicting him on a single charge of improperly discharging a firearm at or into a habitation, with two accompanying firearm specifications. For the reasons that follow, the trial court's judgment is affirmed.

**Statement of the Case**

{¶ 2} On November 5, 2021, appellant was indicted in connection with a shooting incident that occurred on October 21, 2021, at the Laurel Greene Apartments in Clyde, Ohio, and resulted in the death of one victim and in bodily injury to another. Appellant was charged with one count of aggravated murder in violation of R.C. 2903.01(A), an unclassified felony; one count of murder in violation of R.C. 2903.02(A), an unclassified felony; one count of improperly discharging a firearm at or into a habitation in violation of R.C. 2923.161(A)(1) and (C), a second-degree felony; and three counts of felonious assault in violation of R.C. 2903.11(A)(2) and (D)(1)(a), each a second degree felony. All six counts included a specification that appellant committed the offenses while in possession of a firearm pursuant to R.C. 2941.145(A) and a specification that the firearm was subject to forfeiture pursuant to R.C. 2941.1417.

{¶ 3} On November 30, 2022, the matter proceeded to a jury trial on all counts. During the trial, the State presented testimony and evidence from 28 witnesses. Appellant presented testimony and evidence from four witnesses, one of which was appellant himself, who claimed to have acted in self-defense. At appellant's request, the trial court included in its instructions to the jury an instruction on self-defense. Although appellant's trial counsel requested a different instruction than the one the court ultimately provided to the jury, appellant asserts no challenge to that instruction on appeal. Following deliberations, the jurors returned a verdict of guilty on the charge of improperly

2.

discharging a firearm at or into a habitation with the specifications, and not guilty on the remaining charges.

{¶ 4} At sentencing, the trial court imposed a minimum prison term of two years with a maximum prison term of three years on the underlying charge, as well as a mandatory prison term of three years for the firearm specification.

**Statement of the Facts**

{¶ 5} On October 21, 2021, appellant was with his brother-in-law (and co-defendant) Deondre Strange. Strange received a phone call from his sister, A.R., about a fight that had occurred. Appellant and Strange left their residence in Fremont, Ohio and drove to Clyde. Appellant testified that it was his understanding that they were going to pick up A.R. in Clyde, because she had just been hit by a man, J.B. Appellant testified that when he left his residence, he took his gun in case he needed to defend himself.

{¶ 6} Appellant and Strange arrived at L.M. and I.M.'s apartment, located at 233 E. Commerce Drive, and then Strange and I.M., who was Strange's other sister, discussed the details of the altercation between A.R. and J.B. J.B. was L.M.'s brother, who lived next door in apartment 231. During the conversation, which took place inside apartment 233, Strange was angry. With his hand on his gun, he stated that he wanted to go talk to J.B. He also asked appellant if he had his gun. At this point, L.M. and I.M. told appellant and Strange to leave their residence. Appellant testified that he kept saying to Strange, "Yo, we need to go," and "Clearly, we're not wanted here." Meanwhile, I.M. was pushing Strange out of her apartment.

3.

{¶ 7} As appellant and Strange were exiting apartment 233, J.B. emerged from his apartment, and a verbal argument began between Strange and J.B. Appellant testified that before long everyone in the area was outside yelling and it was "very tense." L.M. attempted without success to get J.B. back into his apartment. J.B. was standing on the porch that joined the two apartments, in between a couple of pillars. Appellant and Strange were in the grass outside the apartments.

{¶ 8} At some point, appellant saw J.B. wave his firearm, and he called out "gun, gun gun." L.M. tried to get I.M. back into their residence. Appellant heard one gunshot, then a scream, and then multiple shots. I.M. was struck in the ankle by a bullet before L.M. could get her back inside the apartment. It was determined that the bullet that struck I.M. came from Strange's gun.

{¶ 9} Appellant testified that he was frozen until he felt a "bullet fly by" his head. He stated that he saw J.B., who was standing in front of apartment 233, point a gun in appellant's direction and fire. Appellant testified that he believed his life was in danger, so he pulled his firearm, aimed at J.B.'s chest, and fired in self-defense. Appellant fired all 13 of the bullets that were in his firearm. According to appellant, "[i]t was just rapid fire." During an interview with Detective Stanley of the Clyde Police Department, appellant admitted that he had continued to shoot at J.B. even as J.B., with his back to appellant, was running away from appellant and toward his apartment.

{¶ 10} A juvenile neighbor, B.D., testified that he heard yelling and observed several people outside. B.D. testified that "the guy on the sidewalk, like, reached – I don't

4.

know, he, like reached in his pocket, which – and then the other guy pulled out a gun in the grass, and then they just started shooting."

{¶ 11} B.W., who lived in apartment 231 with J.B., testified that she was inside the apartment during the altercation. B.W. testified that Strange stated, "[W]e're all strapped out here." B.W. testified that when she heard Strange say this, she observed J.B. standing by their door hinges on the door mat. B.W. testified that she heard a shot and then observed J.B. fire "all of his bullets." B.W. testified that J.B. was standing in between the pillars next to their apartment door when she heard the gunfire begin.

{¶ 12} Testimony established that J.B. ultimately retreated inside his apartment and collapsed inside in front of B.W. J.B. was pronounced dead at the scene, having died from his injuries. One bullet had entered the left side of his back, with no exit wound. This bullet was fired from Strange's gun. A second bullet had entered and exited J.B.'s right ankle. That bullet was from appellant's gun.

{¶ 13} During the investigation, it was determined that one of appellant's bullets was found on the floor of J.B.'s apartment 231, and another of appellant's bullets was discovered in a car seat that was located on the floor of I.M. and L.M.'s apartment 233.

### Assignment of Error

{¶ 14} On appeal, appellant asserts the following as his sole assignment of error:

I.     Howard's right of self-defense superseded any duty he may have had to not fire a bullet into one of the apartments.

5.

## Law and Analysis

{¶ 15} It is undisputed that the indictment accused appellant of discharging his firearm, without privilege to do so, at or into 231 East Commerce Drive, which was the apartment shared by J.B. and B.W. Appellant argues that his conviction should be reversed because he acted in self-defense and, therefore, had the privilege to discharge his firearm into J.B.'s home. In support of this claim, appellant cites only *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Heller* -- which specifically involved the constitutionality of several D.C. laws that together banned handgun possession in the home and prohibited rendering operable any lawful firearm in the home -- broadly held that the "Second Amendment protects an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense within the home." *Id.* at paragraph one of the syllabus.

{¶ 16} The case does not support appellant's suggestion that his privilege of self-defense either supersedes any right the victims had to their home being protected and/or necessarily relieves appellant of potential criminal liability in this case. In fact, neither appellant nor independent research by this court has revealed any law, state or federal, that stands for the proposition put forth by appellant that the privilege of self-defense confers blanket immunity for any and all acts committed by an individual who successfully asserts the privilege.

{¶ 17} For a defendant to succeed on a claim of self-defense by means of deadly force requires: (1) that the defendant was not at fault in creating the situation giving rise

6.

to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger. *See State v. Wilson*, 2024-Ohio-776, ¶ 20, citing *State v. Messenger*, 2022-Ohio-4562. (Additional citation omitted.) The intent required for self-defense "is an intent to use force to repel or escape force." *Id.* at ¶ 29.

{¶ 18} In the instant case, even assuming the jury's acceptance of appellant's affirmative defense of self-defense by means of deadly force in connection with the charges of (1) felonious assault as to victim J.B, (2) murder, and (3) aggravated murder, the verdicts would not necessarily require the jury's acceptance of appellant's claim of self-defense in relation to the charge of improperly discharging a firearm at or into a habitation. Given the undisputed evidence -- as related by appellant himself to Detective Stanley -- that appellant continued to shoot at J.B even as J.B., with his back to appellant, was running away from appellant and toward his apartment, a jury could consistently determine that use of deadly force in knowingly shooting into J.B.'s apartment was not justified. [1]

{¶ 19} Even if the verdicts on the six charges were, in fact, inconsistent with one another, such an inconsistency would not require us to overturn appellant's conviction. The law is well settled that "'consistency between verdicts on multiple counts of an

---

[1] We note that appellant in this case does not argue sufficiency of the evidence or manifest weight.

7.

indictment is unnecessary.'" *State v. Nastal,* 2022-Ohio-970, ¶ 28 (6th Dist.), quoting *State v. Miller*, 2023-Ohio-6375, ¶ 8 (6th Dist.). (Additional citations omitted.); *see also State v. Lovejoy*, 79 Ohio St.3d 440, 446 (1997), ("The several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count."). "Even a verdict that acquits on a predicate offense while convicting on the compound offense 'should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.'" *Nastal* at ¶ 28, citing *United States v. Powell*, 469 U.S. 57, 68 (1984), syllabus.

{¶ 20} Thus, although appellant asserted a singular affirmative defense with respect to all six counts, his assumption that the jury must have accepted his affirmative defense for all of those counts is without merit and has no support in law.

{¶ 21} For all of the foregoing reasons, appellant's sole assignment of error is found not well-taken.

8.

**Conclusion**

**{¶ 22}** The judgment of the Sandusky County Court of Common Pleas is affirmed. Appellant is to pay the costs of appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.

_____
JUDGE

Charles E. Sulek, P.J.
CONCUR

_____
JUDGE

Myron C. Duhart, J.
CONCURS, AND WRITES
SEPARATELY

_____
JUDGE

**DUHART, J., Concurring,**

**{¶ 23}** I concur with the majority's determination that there is no law that stands for the proposition that the privilege of self-defense confers blanket immunity for any and all acts committed by an individual who successfully asserts the privilege, and, on those grounds, I agree that appellant's argument on appeal is properly dismissed as meritless.

**{¶ 24}** That said, I feel compelled to address the fact that this court recently reversed the conviction of appellant's co-defendant, in *State v. Strange*, 2024-Ohio-2199

9.

(6th Dist.), a case that appears to be factually analogous to appellant's, on grounds that the trial court committed reversible error in giving the jury an incorrect instruction that affected Strange's substantial rights. As in this case, the trial court in *Strange* failed to identify that it was the state's burden to prove that appellant had not acted in self-defense, as described in R.C. 2901.05. *See Strange* at ¶ 8. And just like in *Strange,* the trial court's error in this case occurred despite objections on the part of both defense counsel and the State. *See id.* at ¶ 5.

{¶ 25} Distinguishing this case from *Strange*, however, is the fact that appellate counsel in *Strange*, unlike appellate counsel in the instant case, assigned as error that the incorrect jury instructions violated Strange's right to due process. *See id.* at ¶ 7. In response to the assignment of error, the State conceded that the trial court erred in giving the erroneous instruction. *See id.* at ¶ 8. But in the instant case, the State remained silent about the unraised issue.

{¶ 26} The law is well-settled that "'courts should not raise constitutional issues sua sponte.'" *State v. Dotson*, 2019-Ohio-4045, ¶ 23 (4th Dist.), quoting *First Merchants Bank v. Gower*, 2012-Ohio-833, ¶ 18 (2d Dist.). "By sua sponte raising a constitutional issue, the court improperly becomes an advocate for one of the parties contrary to its role as arbiter." *Dotson* at ¶ 23, citing *State v. Graham,* 2019-Ohio-1485, ¶ 23 (6th Dist.). Although we are unable to reach the merits of any question regarding the existence, or impact, of improper jury instructions in the current appeal, App.R. 26(B) creates a

procedure by which a defendant's allegations of ineffective assistance of appellate counsel may be considered and evaluated.

{¶ 27} For the foregoing reasons, I concur with the majority opinion in this case.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.